UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
06-CV-3314(JMR/FLN)

Kyle Anthony Strock et al.      )
                                )
            v.                  )          ORDER
                                )
Independent School District     )
No. 281, Robbinsdale,           )
Minnesota et al.                )

Plaintiffs, Kyle Strock and his father, Timothy Strock, have filed a supplemental complaint[1] alleging defendants, Independent School District No. 281, Robbinsdale, Minnesota; Linda Johnson, Board Member; and Stan F. Mack, Superintendent of Schools ("the District") violated the (1) Individuals With Disabilities Education Act ("IDEA"); (2) Rehabilitation Act § 504; (3) Americans With Disabilities Act ("ADA"); and (4) Minnesota Human Rights Act ("MHRA"). Defendants move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Defendants' motion is granted.

---

[1]Plaintiffs' initial complaint was filed with the Minnesota Department of Education. On June 16, 2006, Administrative Law Judge ("ALJ") Kathleen D. Sheehy dismissed the case as moot due to Kyle's graduation.
Thereafter, on August 14, 2006, plaintiffs filed suit in federal court. This Court found the administrative record insufficient, and on March 5, 2007, granted plaintiffs' motion for partial summary judgment; remanded the case for a full administrative hearing on plaintiffs' IDEA claims; and made no definitive rulings on plaintiffs' other claims or on defendants' motion to dismiss.
A full administrative hearing was held April 17-19, 2007, resulting in a 28-page decision issued by Judge Sheehy on May 16, 2007.

I.   Background

In June, 2004, Kyle Strock transferred to Armstrong High School, Independent School District No. 281.  His father, Timothy Strock, arranged for the transfer and provided the school with Kyle's background information.  He advised school officials that, although Kyle had been assessed or diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), he attended regular class, had no special needs, and had not received special education.  District Exhibit ("Dist. Ex.") 9, 12.  Timothy Strock gave the school nurse a health form which said Kyle had ADHD, but did not take any regular medication.  Student Exhibit ("Student Ex.") D89.

A.   Kyle's Junior Year

During his first semester, Kyle took the following courses and earned these grades:

|                    |                 |
|--------------------|-----------------|
| Psychology         | D-              |
| Japanese I         | NC[2]           |
| Chemistry (2 cr)   | C               |
| World Religions    | C               |
| High Algebra I     | NC              |

Dist. Ex. 523.

In some classes, Kyle's grades were caused by his failure to submit homework assignments; in others, he performed poorly on tests.  Student Exs.  D12-13, D16, D18, D89.

---

[2]"NC" means no credit, or failure.

Mr. Strock asked Kyle's teachers for more information about missing assignments.  At the end of the semester, Mr. Strock met with Kyle's guidance counselor, who agreed to meet with Kyle more frequently the following semester.  Although Mr. Strock knew the school offered special education, he did not discuss it or seek any accommodation for Kyle at this meeting.  Dist. Ex. 114; Transcript ("Tr.") 682.   Mr. Strock believed special education was stigmatizing and inappropriate for a student with good intelligence.  Tr. 679.

Early in 2005, Kyle passed Minnesota's Basic Skills Tests[3] in math, reading, and written composition.[4]  Dist. Exs. 35-36.  In March and April, 2005, Kyle's guidance counselor met with him regarding missing assignments.  Dist. Exs. 116-17.  Kyle said he had not been motivated to complete his homework, but he would make an effort in the future to submit his assignments on time.  Id.

The next semester, Kyle took the following courses and earned these grades:

|  |  |
|---|---|
| Creative Fiction Writing | D- |
| Multicultural Literature | NC |
| Network Web Design | D+ |

---

[3]Minnesota students must pass these tests before they are permitted to graduate.

[4]Kyle's math score indicated he was on par with 11th grade students statewide.  Dist. Exs. 526, 584; see also Tr. 113.  On the written composition test, he received the same passing score as the majority of students at Armstrong High School.

| | |
|---|---|
| Computer Graphic Design | NC |
| Japanese 1 II | NC |
| High Algebra | NC |

Dist. Ex. 523.

Kyle's grades in Multicultural Literature, Japanese, and Algebra were again primarily based on his failure to turn in assignments. In Creative Writing, he received good grades on the assignments he submitted on time, but less credit when they were late. During the semester's first quarter, Kyle received mostly A's in Network Design, but his final grade suffered because he failed to turn in one large project and four other assignments. Student Exs. D22-23.

During this time, Kyle worked at Cub Foods. His work was restricted to four or fewer shifts per week (12 to 16 hours). Near the end of his junior year, largely due to his father's concerns about his grades, Kyle reduced his schedule to weekend shifts. Tr. 662-63.

On August 8, 2005, the summer following his junior year, Kyle saw his family doctor regarding his school performance. The doctor recommended a formal evaluation at the Alexander Center for Child Development and Human Behavior and/or the Park Nicollet Adult Mental Health Department. He explained that addressing Kyle's problems and setting up necessary interventions would take some time. Dist. Exs. 500-501.

4

B. <u>Kyle's Senior Year</u>

    1. <u>Section 504 Accommodations</u>

On August 20, 2005, Kyle's father instructed the school to release Kyle's records to the Alexander Center. He also requested that all of Kyle's teachers complete assessment forms to assist with the Center's evaluation. After receiving the teachers' responses, the guidance counselor forwarded the completed assessment forms directly to the Center. Dist Ex. 120; Tr. 172-73.

On October 4, 2005, Kyle was evaluated by an Alexander Center multi-disciplinary team. The team concluded that Kyle met the criteria for ADHD, inattentive type, and recommended that he begin taking appropriate medication and seek a § 504 plan[5] at school to accommodate his needs. The next day, Kyle began taking Concerta, a prescription medication for ADHD. His recommended dosage was gradually increased over the next few months. Student Ex. A44.

On October 18, 2005, Kyle's father met with the school guidance counselor to discuss the § 504 plan. Mr. Strock gave the counselor a redacted version of the Alexander Center report, including its ADHD diagnosis and plan recommendation, but excluding the test results. Student Exs. A19-A21. On November 9, 2005, the school's § 504 committee, which included school guidance counselors, a psychologist, a social worker, and an assistant

---

[5]Section 504 of the Rehabilitation Act of 1973 provides for individualized plans designed to accommodate the unique needs of an individual with a disability, and is required by the ADA.

principal, submitted a proposed plan[6] to Mr. Strock.  Mr. Strock rejected it.[7]

The next day, the guidance counselor gave Mr. Strock a revised plan, which he approved.  As written, Kyle's teachers would, upon request, give Kyle additional time on assignments and tests, if feasible; provide him with an extra set of class notes; allow Kyle to take notes in class with his personal laptop; give him reminders to stay on task; and communicate with his father as needed.  Dist. Ex. 51.  That same day, the counselor circulated the final plan to Kyle's teachers.

After the revised plan was in place, problems persisted.  For example, in early December, 2005, Kyle's father emailed Cindy Smith, Kyle's Western Civilization teacher, complaining that Kyle

---

[6]The plan proposed (1) giving Kyle additional time on assignments and tests, if requested; (2) seating him in a low distraction work area; (3) giving Kyle reminders to stay on task, if needed; and (4)communication from the school with his father, as needed.  It also proposed that Kyle record daily assignments in a planner, request needed assistance, participate in study groups, and be prepared to attend supplemental study hours before and/or after school.  Under the plan, Mr. Strock would monitor Kyle's grades and attendance using the school's "parent-connect" website.  Dist. Ex. 49.

[7]Mr. Strock claimed a low distraction work area was unacceptable because Kyle would be unable to sit by his friends.  He further claimed Kyle's "situation [was] not a matter of intelligence and tutoring, [rather] simply a matter of doing his homework."  Lastly, he claimed it was unrealistic to hold Kyle responsible for keeping track of his assignments.  He proposed, instead, that on a daily basis, Kyle's teachers verify that his assignments were written down and his materials were in his backpack.  Dist. Ex. 48.

had not received full credit for a late-submitted assignment. Ms. Smith said she would give Kyle extra points, but stated that undefined due dates may not be the best way to help Kyle. She recommended scheduling a time to meet with Kyle after school, placing some limits on assignment deadlines to help him develop better habits, and giving Kyle even more time to complete his work.

Kyle's father replied that he had allowed the § 504 plan's "stigma" on Kyle's record because he believed Kyle could submit work without penalty, regardless of when he turned it in. Dist. Ex. 146. He told Ms. Smith, "[f]rankly Cindy, at this point we are not trying to help him develop better habits, we are simply trying to help him graduate." He also said he would remove Kyle from the § 504 plan and have the "stigma removed from his permanent record, because it [was] obviously not a help." These statements notwithstanding, Ms. Smith felt the § 504 plan was helpful, and she agreed to allow Kyle to submit assignments whenever he was able to do so. Student Ex. A10. Kyle's other teachers made similar concessions.[8]

On January 23, 2006, Mr. Strock complained to an assistant principal about the § 504 plan. He said it had not been implemented in the classrooms, and he was frustrated that the teachers took three to four days to respond, rather than 24 hours.

---

[8]Kyle's teachers promptly responded to Mr. Strock's requests for updates, identifying missing assignments and tests, and allowing Kyle to revise and resubmit homework assignments. Student Exs. M6-7

The school assigned a different guidance counselor to Kyle at his father's request.  Student Ex. C4-5.  The new counselor, Jamie Dukowitz, continued the school's efforts to accommodate Kyle's needs and sent copies of the § 504 plan to each of Kyle's second semester teachers.  Dist. Exs. 54-55.  On January 31, 2006, Mr. Dukowitz scheduled a meeting with Kyle's second semester teachers to ensure they properly implemented the plan.  Dist. Ex. 193. After making these arrangements, and with Mr. Strock's approval, Mr. Dukowitz arranged for Kyle to take a one-credit work experience course through Intermediate District No. 287, because Kyle was two credits behind qualifying for spring graduation.  Mr. Dukowitz also arranged for Kyle to repeat the Multicultural Literature class he failed the previous spring, this time as an independent study course.  Tr. 109-110.

2.  <u>Kyle's Senior Year</u>

Kyle's first semester senior year grades were as follows:

| | |
|---|---|
| Classic World Literature | C |
| Contemporary World Lit. | C- |
| High Algebra | D- |
| Japanese | B+ |
| Western Civilizations | D |
| World Geography | D |

Dist. Ex. 523-24; Student Ex. F40.

Kyle continued to submit late assignments and perform poorly on tests, although there had been some improvement.

During his second semester, and under the § 504 plan, Kyle earned the following grades:

|  |  |
|---|---|
| Team and Life Sports | A- |
| High Algebra II | D+ |
| Sports and Leisure | B |
| Japanese 1 II | C |
| Sculpture and Ceramics | B |
| Space and Weather | B- |
| Multicultural Literature | C+ |

Dist. Ex. 524.

During the second semester, Kyle's results improved because he timely submitted assignments in most of his classes.  In Algebra, he turned in all but one assignment, but continued to perform poorly on quizzes and tests.  Student Exs. D4-D6.

When Kyle began his senior year, he ranked 467/548 in his class, with a 1.838 grade point average.  Kyle passed each part of the Minnesota Basic Skills test, and scored in the average to superior range on the Weschler Adult Intelligence Scale.  On June 2, 2006, Kyle completed high school with a cumulative GPA of 1.912, slightly lower than the 2.00 GPA he presented when entering Armstrong High School.

### 3.  College Transition

On September 25, 2006, Kyle took COMPASS[9] placement tests at

---

[9]COMPASS is an untimed computerized college evaluation test used to place students into appropriate courses.  The test covers

Normandale Community College.  Based on his scores, he was placed in elementary-level algebra, a course for which he would receive no college credit.[10]

Kyle's writing scores qualified him for college-level Freshman Composition with no further preparation.  Tr. 114-16; Student Ex. A79.

In spite of being allowed to enter community college, Kyle elected against doing so.  He opted, instead, to work as a Blockbuster Video customer service representative and a Target cashier.  Tr. 567-68.

### 4. Administrative Proceedings and Findings

On April 3, 2006, approximately 60 days prior to his high school graduation, Kyle filed a request for a due process hearing with the Minnesota Department of Education seeking an expedited special education evaluation.  Notwithstanding his upcoming graduation, he requested he be examined in order to be declared eligible for special education.  He also sought additional accommodations allowing timely graduation and successful transition to college.  In this request, he claimed the District had reason to

---

reading, writing, math, writing essay, and English as a second language.

[10]"[T]his is not an unusual placement for incoming freshman students [and] the college offers 20 sections of this course each semester.  At North Hennepin Community College, a school many Armstrong graduates attend, approximately 60% of [these] students take elementary algebra their first year."  (ALJ Decision, May 16, 2007).

suspect he suffered from a disability and needed special education, but failed to make the appropriate evaluation. Kyle claimed his poor school performance resulted from the District's failure to afford him sufficient support and services.

Specifically, Kyle demanded that the District accommodate him by: (1) modifying its standard graduation requirements; (2) modifying its grading and performance standards to grant him credit for courses in which he had shown adequate performance; (3) providing necessary compensatory education services; (4) omitting from his transcript any indication of inability to perform at a standardized level, absent support necessitated by his disability; (5) affording him a timely graduation with his class; (6) giving him necessary skills with which to transition to college; and (7) ensuring, at a minimum, that he be allowed to participate in the spring graduation ceremony. Alternatively, if the evaluation he demanded did not find him eligible for special education, he sought a revised § 504 plan with identical accommodations.

The District performed the requested special education evaluation.[11] On April 25, 2006, Kyle signed a consent form which allowed the District's physician and mental health professional,

---

[11]The District first filed a motion to dismiss the request for hearing, alleging the complaint was insufficient. A hearing officer denied the motion. (Order Denying Motion to Dismiss, May 3, 2006). Later, on May 12, 2006, the District filed a motion to assign the burden of persuasion to Kyle. This motion was also denied. (Order Regarding District's Motions to Assign Burden of Persuasion, May 17, 2006).

Dr. Thomas Gratzer, to verify his ADHD diagnosis.  Kyle and his father went to Dr. Gratzer's office.  However, they left the office without completing the examination because Kyle was unwilling to answer the questions on the Minnesota Multiphasic Personality Inventory ("MMPI").  Tr. 552-54.  Although Kyle signed a second consent form on May 10, 2006, which expressly permitted the administration of an MMPI, he never rescheduled the examination. The District continued to attempt its evaluation using its special education staff.

On May 23, 2006, just days before graduation, Kyle saw Dr. Judson Reaney, a behavioral pediatrician associated with the Alexander Center.  Dr. Reaney told Kyle that the Connor's Continual Performance Test previously administered by the Center was a nonclinical instrument, and did not definitively determine whether Kyle did or did not have ADHD.  Dr. Reaney ultimately concluded Kyle met the DSM-IV criteria for the ADHD diagnosis.  He therefore recommended the District continue to provide § 504 accommodations.

On June 2, 2006, the District moved to dismiss Kyle's request for a hearing because Kyle had received sufficient credits to graduate with a regular diploma and, according to the District, his IDEA claims were moot.  The ALJ denied the motion.  (Order Denying Motion to Dismiss, June 8, 2006).  On June 9, after Kyle participated in the school's graduation ceremony, the District sought reconsideration of its dismissal motion.  The hearing

officer granted reconsideration and dismissed the request for hearing with prejudice. (Order, June 16, 2006). <u>See</u> <u>also</u> <u>supra</u> note 1, at 1.

As set forth in note 1, this Court entered an Order on March 5, 2007, directing a full administrative hearing and decision. The ALJ conducted a hearing on the merits regarding Kyle's IDEA claims and found (1) the District did not violate state or federal child-find standards by failing to initiate a special education evaluation of the student prior to the April, 2006, request; (2) the student was not eligible for special education because he did not require special instruction to initiate and complete tasks; (3) the District's accommodations were sufficient to allow the student to make progress in regular education and to graduate from high school; and (4) the District did not deny the student a free appropriate education ("FAPE"). The ALJ made no conclusions as to any other claims.

II. <u>Analysis</u>

    A. <u>Standards of Review</u>

        1. <u>Administrative Agency's Decision</u>

Upon appeal from the final determination of a state administrative process under the IDEA, this Court makes an independent decision of the issues, giving due weight to the administrative proceedings. <u>Pachl v. Seagren</u>, 453 F.3d 1064, 1068 (8th Cir. 2006); <u>Fort Zumwalt Sch. Dist. v. Clynes</u>, 119 F.3d 607,

610 (8th Cir. 1997). Although, this Court accords less deference to the state proceedings than required under the substantial evidence test commonly applied in federal administrative law cases, particular consideration is given to state officials' educational judgments. <u>Indep. Sch. Dist. No. 284 v. A.C., by and through her Parent, C.</u>, 258 F.3d 769, 773-74 (8th Cir. 2001).

2. <u>Motion to Dismiss Standard</u>

To survive the District's motion to dismiss, plaintiffs must provide something more than a simple statement of facts creating a suspicion of a legally cognizable right of action. <u>Bell Atlantic Corp. v. Twombly</u>, --- U.S. ---, 127 S. Ct. 1955, 1965 (2007) (internal quotations and citation omitted). They must make factual allegations which, when taken as true, are sufficient to "raise a right to relief above the speculative level." <u>Id.</u> Plaintiffs have failed to meet this standard. The Court addresses each claim in turn.

B. <u>Preliminary Matters</u>

Before considering the merits of plaintiffs' allegations, the Court considers whether this matter is barred by a lack of subject matter jurisdiction, standing, or mootness.

1. <u>Subject Matter Jurisdiction</u>

The District argues, pursuant to Fed. R. Civ. P. 12(b)(1), that this Court is "bereft of subject matter jurisdiction to entertain [plaintiffs' education] claims" because Kyle graduated

14

from high school and moved to another district, thereby rendering his claims moot.  The District is incorrect; it misapprehends the analytic distinction between subject matter jurisdiction, and whether plaintiffs' claims are ripe or justiciable.  Simply put, this Court has subject matter jurisdiction because plaintiffs' claims are not "so completely devoid of merit as not to involve a federal controversy."  Owasso Indep. Sch. Dist. No. I-011 v. Falvo, 534 U.S. 426, 431 (2002).  Plaintiffs' claims survive the District's 12(b)(1) challenge.

### 2.   Standing

The District next contends Timothy Strock lacks standing because he cannot show a direct personal injury.  The District is incorrect.  Parents have an independent stake in substantive decisions regarding their children.  Winkleman ex rel. Winkleman v. Parma City Sch. Dist., 127 S. Ct. 1994, 2004 (2007).  The IDEA recognizes this when it provides procedural safeguards permitting parents to obtain administrative and judicial review.  M.P. ex rel. v. Indep. Sch. Dist., 326 F.3d 975, 979-80 (8th Cir. 2003).  Thus, Timothy Strock is properly before the Court.

### 3.   Mootness

The District next claims plaintiffs' IDEA claim is moot, arguing that Kyle's graduation and move to another school district cost him his claim to relief.  The Court recognizes the Eighth Circuit Court of Appeals holding in Thompson v. Bd. of the Special

Sch. Dist. No. 1, finding a student's IDEA claim moot after he left his former school district without seeking any relief until after his departure.  144 F.3d 574, 579 (8th Cir. 1998).  In Thompson, the old district was not responsible, since the plaintiff had moved to another school and another district.  Id.  While this is true, the Court also considers Indep. Sch. Dist. No. 284, where the Eighth Circuit found a continuing controversy.  258 F.3d at 774-75. In that case, as here, the student pursued her remedies, had a due process hearing concerning the old district, and all issues had not been fully adjudicated prior to her move to another district.  Id. Under these circumstances, plaintiffs' IDEA claim is not moot.  See also Zobrest v. Catalina Foothills Sch. Dist., 509 U.S. 1, 4 n. 3 (1993) (continuing controversy remained post-graduation).  With these preliminaries concluded, the Court turns to the merits.

C.   IDEA Merits

The IDEA provides disabled children access to a FAPE.  Bd. of Educ. v. Rowley, 458 U.S. 176, 203 (1982); 20 U.S.C. §§ 1400-1487. Among its purposes, the IDEA "ensure[s] that all children with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A) (Supp. V. 2005).[12]  The IDEA

---

[12]The Department of Education issued new IDEA regulations effective Oct. 13, 2006.  See 71 Fed. Reg. 46540 (Aug. 14, 2006). Plaintiffs' claims, if any, accrued April 3, 2006, prior to the

16

defines "FAPE" as:

> special education and related services that (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d).

20 U.S.C. § 1401(9) (Supp. V. 2005).

The IDEA's "child-find" obligation imposes on a school district the affirmative duty to identify, locate, and evaluate all children with disabilities within its jurisdiction. 20 U.S.C. § 1412(a)(3). The duty is triggered if the District has reason to suspect a disability, and to suspect that special education services may be needed. (ALJ Decision, May 16, 2007, at 21). When such suspicions exist, the district must evaluate the student within a reasonable time after school officials have notice of behavior likely to indicate a disability. Id. at 21-22. Here, the ALJ found the District did not violate any state or federal child-find obligation. Id. at 23.

When Mr. Strock enrolled Kyle, he told the school Kyle did not require special education and had always been in regular classes. The mere existence of an ADHD condition does not demand special education. Children having ADHD who graduate with no special

---

2006 Regulations. As a result, the later Regulations are not applicable.

education or any § 504 accommodation are commonplace. On these facts, the ALJ found the District's handling of Kyle's condition was reasonable in light of Kyle's lack of motivation to turn in his homework; his passing, and at times, higher performance on tests; and his average scores on the Minnesota Basic Standards tests. <u>Id.</u> The ALJ similarly found Kyle did not qualify for special education under the "Other Health Disability" or "Special Learning Disability." <u>Id.</u> Based on a review of the record, and affording due weight to the ALJ's findings, the Court fully concurs in the ALJ's determinations and finds the District provided Kyle with a FAPE.

The Court also finds Kyle's alleged unsuccessful transition to college affords him no relief. He was allowed to enroll at Normandale Community College upon graduation. That he was required to take certain remedial courses is neither unusual nor evidence of "unsuccessful transition," an entirely undefined term. Plaintiffs make no effort to suggest the outlines of a successful college transition, but the Court finds that being required to take a course which approximately 60% of a student's fellows must take is scarcely evidence of unsuccessful transition. Kyle achieved placement examination scores which were sufficient to allow him to attend college. The Court finds, as a matter of law, that Kyle's transition to Normandale Community College does not constitute actionable "unsuccessful transition," if indeed such a claim exists

at all.

Notwithstanding plaintiffs' facile declaration that the District failed to "make meaningful [Kyle's] high school diploma," the law does not require the District to maximize Kyle's potential. See Bd. v. Rowley, 458 U.S. at 189-90. Consequently, plaintiffs possess no legal right under the law to anything beyond the FAPE Kyle received.

D. <u>Discrimination Claims</u>

Plaintiffs invoke § 504 of the Rehabilitation Act, the ADA, and the MHRA in alleging that the District discriminated against Kyle on the basis of disability. The enforcement, remedies, and rights are virtually identical under these statutes. <u>Smith ex rel. Townsend v. Special Sch. Dist. No. 1 (Minneapolis)</u>, 184 F.3d 764, 767 (8th Cir. 1999). Section 504 provides that:

> [n]o otherwise qualified individual with a disability . . . shall . . . solely by reason of her or his disability, be excluded from the participation in, be denied the benefit of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794(a).

Title II of the ADA "prohibits qualified individuals with disabilities from being excluded from participation in or the benefits of the services, programs, or activities of a public entity." <u>Birmingham v. Omaha Sch. Dist.</u>, 220 F.3d 850, 856 (8th Cir. 2000). Under under the MHRA, discrimination against a person because of disability is prohibited. <u>See</u> Minn. Stat. § 363A.13,

subd. 1.   To recover under these statutes, plaintiffs must show "gross misjudgment or bad faith" on the part of school officials. <u>Hoekstra v. Indep. Sch. Dist. No. 283</u>, 103 F.3d 624, 626 (8th Cir. 1996).

Plaintiffs' factual allegations relating to these claims, even if taken as true, are entirely insufficient to satisfy the pleading standards elucidated in <u>Bell Atlantic</u>.   Plaintiffs' allegations do not even raise a legitimate speculation that the District or its employees discriminated against Kyle at all, let alone as a result of any disability.   To the contrary, the Court easily finds the District's continuous efforts to accommodate the wishes of Kyle and his father offer compelling evidence to the contrary.   Consequently, plaintiffs' discrimination claims fail.

III.   <u>Conclusion</u>

Because plaintiffs are unable to plead any set of facts, taken as true, that entitle them to relief, the Court grants defendants' motion to dismiss.

IT IS SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:   March 21, 2008

<u>s/ James M. Rosenbaum</u>
JAMES M. ROSENBAUM
United States Chief District Judge